[No. A059436. First Dist., Div. Two. Apr. 1, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
MARLOWE LEE HILL, Defendant and Appellant.

## COUNSEL

Susan D. Shors, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, and Richard Rochman, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KLINE, P. J.**—Marlowe Hill appeals from convictions of mayhem and aggravated assault. He contends the trial court gave an erroneous instruction pertaining to the mayhem count and improperly imposed the aggravated term in sentencing on that count. We affirm the conviction but remand for resentencing.

### STATEMENT OF THE CASE

Appellant was charged by information filed on May 13, 1992, with one count of assault by means of force likely to produce great bodily injury (Pen.

Code, § 245, subd. (a)(1))[1] and one count of aggravated mayhem (§ 205). It was further alleged that appellant inflicted great bodily injury upon the victim in the commission of the assault (§ 12022.7.)

Trial began on July 13, 1992, and on July 21 the jury convicted appellant of the charged assault, found the great bodily injury allegation true, and convicted appellant of mayhem (§ 203), a lesser offense of the charged aggravated mayhem.[2]

Appellant was sentenced on October 2 to the upper term of eight years on the mayhem count. Sentence on the assault count and great bodily injury enhancement was stayed pursuant to section 654.

Appellant filed a timely notice of appeal on October 22, 1992.

### STATEMENT OF FACTS

On the evening of January 4, 1992, Kenneth Gordon attended a play with a friend and then went to a bar on Polk Street. He returned to his car, which was parked on Sutter Street, about 1:45 a.m. When he started the car and put it in reverse, it lurched backward and tapped the bumper of the car behind. Gordon heard someone yell from behind him and saw appellant coming towards him. He remembered nothing that followed.

After an evening of heavy drinking, appellant and Heather LaFlamme had just returned to appellant's car, which was parked immediately behind Gordon's. According to their testimony, both appellant, an alcoholic, and LaFlamme were very intoxicated and appellant did not remember portions of the latter part of the evening. As they were standing on either side of appellant's car, LaFlamme yelled to appellant that someone was hitting his car. Appellant walked toward Gordon's car, screaming and cursing.

According to witnesses, appellant approached Gordon's car and hit him in the face a number of times with his fist or elbow through the open window. He then pulled Gordon from the car and stomped on and kicked his face as he lay on the ground, apparently unconscious. Appellant then returned to his car and drove away. One of the witnesses recorded appellant's license plate number and gave it to the police. Appellant was stopped and taken into custody shortly thereafter. He did not appear to be intoxicated to the arresting officers.

---

[1]All further statutory references will be to the Penal Code unless otherwise specified.

[2]While aggravated mayhem (§ 205) requires specific intent to cause the disfiguring injury, simple mayhem (§ 203) is a general intent crime. (*People* v. *Ferrell* (1990) 218 Cal.App.3d 828, 832-833 [267 Cal.Rptr. 283].)

At trial, appellant apologized to Gordon for the injuries he inflicted. He testified that he was under a lot of stress on the night in question, since he had recently lost his job, had no money and had a new baby. At the time of the incident, a flashback to a very bad experience in the Army was going through appellant's mind.

Gordon's injuries were described by Dr. Newton Gordon, the chief of dentistry, oral and maxial facial surgery at San Francisco General Hospital, who treated Gordon and testified as an expert at trial. When first seen, Gordon's face was swollen, with a laceration over his left eyebrow and cuts and bruises all over. He was unable to properly move his left eye and could not read normal size print. Gordon's nose had been shifted to the right and straight down. The orbital cavity was fractured, causing the left eye to drop lower than the right. The left cheek bone was caved in and the right cheek bone and orbital were fractured. The middle third of Gordon's face was displaced and separated from the cranium, a condition classified as the most serious type of facial trauma. The maxillary sinus cavity was filled with blood and bone fragments.

In surgery, metal plates and wires were implanted to hold Gordon's facial bones together. A prosthetic device was initially implanted to hold Gordon's left eye in place; in a subsequent operation that device was replaced with bone taken from Gordon's hip. The left eye socket remained larger than the right, which caused the left eye to appear sunken and prevented proper focusing. As a result, Gordon suffered double and triple vision. Gordon's left eye received no moisture from his body because of a fracture that prevented drainage through the left tear duct and he was required to use eye drops on a regular basis. Due to nerve damage, the sensation in Gordon's upper lip was impaired, so he might bite or burn himself.

The doctor testified it would not be possible to tell for at least a year whether the nerve damage and damage to the muscles controlling the eye would be permanent or what visual impairment Gordon would continue to suffer. Gordon faced the possibility of future problems with serious sinus and eye infections and further surgery was planned to reconstruct Gordon's nose and repair his tear duct. As a result of the surgeries, Gordon had regained approximately 90 percent of his vision and was able to read and drive. Despite these improvements the doctor testified there was a strong possibility Gordon would have continuing eye and visual problems due to the attack. According to the doctor, Gordon would limp for "quite awhile" due to the large segment of bone taken from his hip. Finally, the doctor stated that although Gordon would not look exactly as he did before the injuries, it was hoped that when the surgeries were completed one would have to look very closely to detect the differences.

## DISCUSSION

### I.

Section 203 provides as follows: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." █ To prove mayhem based on a disfiguring injury, the injury must be permanent. (Perkins & Boyce, Criminal Law (3d ed. 1982) p. 242; LaFave & Scott, Substantive Criminal Law (1986) § 7.17, p. 322; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 446, pp. 501-502.)

Upon request of the prosecution the trial court instructed the jury as follows: "The infliction of an injury forbidden by a mayhem statute may constitute an offense notwithstanding the possibility that alleviation of the injury is medically possible. [¶] Although a slight and temporary disability is not mayhem, a disability lasting for an extended period of time may be sufficient to satisfy the requirement of permanent disability. [¶] Likewise, the law does not require that a loss, or disability be a total loss or disability of a limb, organ or other member of the body or its function thereof. It requires that a person be unable to use the affected limb, organ, or other member of the body even though corrective measures may alleviate the condition." █ Appellant objected to this instruction at trial and maintains this instruction erroneously advised the jury that, in determining the permanence of the injuries, it could not consider evidence that the disfigurement might be alleviated by medical procedures.

█ At the outset, we are compelled to point out that even if the court had erred in giving this instruction, the error would be harmless, as the victim clearly suffered "permanent" injuries based on any reasonable understanding of that word. Appellant suggests Gordon's injuries were not permanent because the medical expert testified that, after multiple surgeries were completed, one would have to look "very closely" to notice his injuries. This evidence does not end the inquiry, however. The record shows that the victim had metal plates and wires permanently implanted in his head to hold his facial bones in place; that his left eye appeared sunken; that he suffered double and triple vision; that, due to the tear duct injury, he would forever have to use eye drops to moisten his eyes; that the sensation in his upper lip was impaired; and that he faced an increased chance of sinus and eye infections. In view of this evidence we cannot see how any jury reasonably could have determined Gordon had not been permanently disabled or disfigured, even if the disputed instruction had not been given. The asserted error

could not have been prejudicial. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

**(2b)** We are also unpersuaded by the substance of appellant's argument. The challenged instruction was based on a footnote from our opinion in *People* v. *Keenan* (1991) 227 Cal.App.3d 26 [277 Cal.Rptr. 687]. In that case the defendant used a cigarette to burn the breasts of his victim, which left scars that remained at the time of the preliminary hearing, three and one-half months after the attack. For purposes of our opinion, we assumed the scars were permanent, but observed, "[t]he fact it might be medically possible to remove the scars . . . would in any event be insufficient to alleviate the offense. (*Perkins* v. *United States* (D.C.App. 1982) 446 A.2d 19, 26; *United States* v. *Cook* (1972) 149 App.D.C. 197 [462 F.2d 301, 304, fn. 23]; *Lamb* v. *Cree* (1970) 86 Nev. 179 [466 P.2d 660, 663]; *Slattery* v. *State* (1874) 41 Tex. 619, 622.)" (*Id.*, at p. 36, fn. 6.) Appellant argues the cases relied upon do not stand for the proposition for which we cited them. Further, he asserts that later cases from these jurisdictions demonstrate such evidence is relevant to the issue of permanence.

The cases cited in *Keenan* do indeed suggest the possibility of medical alleviation ought not be used to diminish one's culpability for infliction of an injury that would otherwise constitute mayhem. In *Lamb* v. *Cree* (1970) 86 Nev. 179 [466 P.2d 660], the defendant bit off a piece of her victim's ear, which was surgically reattached. The court, noting that the resulting disfigurement was "slight," explained that a conviction for mayhem was nonetheless possible: "Absent the plastic surgery, disfigurement may have existed. We do not believe the skill of a surgeon in correcting a disfigurement by plastic surgery should give license to one desirous of committing mayhem." (*Id.*, at p. 663.) The quoted statement directly supports the proposition for which it was cited in *Keenan*. *Lamb* is not inconsistent with the later Nevada case of *Crawford* v. *State* (1984) 100 Nev. 617 [691 P.2d 433, 434], as appellant contends. In *Crawford* the court noted only that because the victim's ear could not be reattached the injury was *permanent.* The court did not invite the use of medical evidence to prove the injury was correctable, as appellant would have us believe.

The other cases cited in *Keenan* also indicate that possible medical alleviation would not defeat a mayhem conviction. Thus, in *Slattery* v. *State* (1874) 41 Tex. 619 the defendant bit off the lower lip of his victim. The court stated that even if the lip had grown back, the defendant would still be

liable for mayhem "irrespective of whether or not [the victim] was relieved of the inconvenience of his loss afterwards."[3] (41 Tex. at p. 621.)

The cases cited in *Keenan* from the District of Columbia are also on point. In *United States* v. *Cook* (D.C. Cir. 1972) 462 F.2d 301 [149 App.D.C. 197], the court relied on *Slattery* for the assertion that mayhem may be founded on a remediable injury. *Perkins* v. *United States* (D.C.App. 1982) 446 A.2d 19, is similar to the present case; the court held there that it was proper to reject a defense instruction that disfigurement was not permanent if it could be removed through medical procedures. (*Id.*, at p. 26.) Appellant's claim that the footnote in *Keenan* that was the basis of the challenged instruction lacks foundation in the law is therefore meritless.

We must also reject appellant's claim that the footnote in *Keenan* and the instruction at issue are contrary to settled California law permitting use of medical alleviation evidence in mayhem cases to show that an injury is not permanent. In each of the cases relied upon by appellant the medical evidence was used to establish an injury was permanent, and thus would support a conviction for mayhem. (*People* v. *McKelvy* (1987) 194 Cal.App.3d 694, 698 [239 Cal.Rptr. 782] [blindness "probably" permanent]; *People* v. *Nunes* (1920) 47 Cal.App. 346, 350 [190 P. 486] [chance of curing blindness "practically nil"]; *People* v. *Dennis* (1985) 169 Cal.App.3d 1135, 1138 [215 Cal.Rptr. 750] [eye injury permanent]; *People* v. *Page* (1980) 104 Cal.App.3d 569, 577 [163 Cal.Rptr. 839] [permanent tattoo].) In contrast, we have discovered no cases—and appellant has cited none—that allow the use of medical testimony to prove a mayhem conviction is unwarranted because the injury can be cosmetically alleviated.

While no California court has expressly held that evidence of medical alleviation may not be used by the defense to prove the injuries are not permanent, recognized criminal law authorities suggest such evidence ought not be available for that purpose. Thus, Perkins and Boyce state that "[w]hether an injury, permanent in its nature, would be held insufficient if corrected by one of the miracles of modern surgery, is perhaps still in doubt. *The indication is that it would be sufficient for mayhem if permanent in its nature, despite such marvelous restoration.*" (Perkins & Boyce, *op. cit. supra*, p. 242.) Similarly, LaFave and Scott write that there "'have long been indications that the infliction of an injury forbidden by a mayhem-type

[3]The later cases from Texas appellant cites are not inconsistent with this view. In *Key* v. *State* (1913) 71 Tex.Crim. 642, 644 [161 S.W. 121], the court concluded an attack might only be a simple assault, rather than a maiming or mayhem, if there was no serious injury and the disfigurement was slight. In *Cox* v. *State* (1951) 156 Tex.Crim. 444 [242 S.W.2d 369, 370] the court simply stated that an injury would not support a conviction for mayhem unless the victim were deprived of the use of a member of his body.

statute may constitute an offense *notwithstanding the possibility that allevia-tion of the injury is medically possible.*' " (LaFave & Scott, *op. cit. supra,* § 7.17, p. 322, italics added.)

Appellant's position is also inconsistent with one of the fundamental objectives of our penal justice system; that one's culpability and punishment should be commensurate with the gravity of both the criminal act undertaken and the resulting injuries. If we were to accept appellant's claim, a defendant who inflicts a serious injury that ordinarily would support a conviction for mayhem may avoid punishment for that offense if extraordinary medical efforts might, in the future, mitigate the disfigurement. Such a result would undermine the Legislature's intention to punish intentional disfigurement more severely than a simple assault causing relatively minor injuries and conflict with our communal sense that one should be held responsible for the natural consequences of his or her acts.

Moreover, if evidence of medical alleviation were permitted to be used as appellant suggests, culpability might vary depending on the quality of the medical care available to the victim. It would thus be possible for two individuals to receive inconsistent verdicts and punishments for the very same acts simply because the victim of one could obtain superior medical care. We decline appellant's invitation to endorse such a result and conse-quently reject his contention that evidence of medical alleviation may be used in a mayhem trial to prove an injury, permanent by its nature, may be corrected by medical procedures.

Our decision is premised on the belief that, in a prosecution for mayhem, the word "permanent" can no longer be applied in its literal sense since medical technology is increasingly capable of effective cosmetic repair of injuries that would otherwise be permanently disfiguring. Advances in med-ical technology do not, however, in any way diminish the culpability of one who intentionally disfigures another. We therefore reject appellant's claim that the instruction improperly relieved the prosecution of the need to prove that the disfiguring injury was permanent. The jury was properly instructed regarding the elements of mayhem[4] and the instruction at issue did not in any way suggest that permanence was not required. As we have explained, the challenged instruction only advised the jurors that an injury may be

---

[4]Although the courts and noted criminal law authorities regularly assume that mayhem requires a permanent injury (see, *ante,* at pp. 1571 and 1573), section 203, which defines simple mayhem, does not mention this requirement. As a result, the relevant CALJIC instruction (which was used here) does not list permanence as an element of the offense. (CALJIC No. 9.30.) This curious dissonance probably arises from the fact that historically the sorts of injuries that ordinarily would support a charge of mayhem were by their nature not remediable, and thus it was not necessary to specify that the injury must be permanent.

considered legally permanent for purposes of mayhem despite the fact that cosmetic repair may be medically feasible. In this context that is the proper legal understanding of the word "permanent."

## II.

Before sentencing appellant the court weighed the two aggravating factors—that the crime involved great bodily harm (Cal. Rules of Court, rule 421(a)(1)) and that appellant engaged in conduct indicating a danger to society (Cal. Rules of Court, rule 421 (b)(1))—against the relevant mitigating factors[5] and found the aggravating factors predominated. The court thus sentenced appellant to the upper term of eight years on the mayhem conviction (based on the great bodily injury) and the upper term of four years on the assault conviction (based on the fact appellant presented a danger to society). ■ Appellant now argues the court erred in imposing the aggravated sentence for mayhem based on the fact the victim suffered great bodily injury when great bodily injury is an element of that offense. The Attorney General concedes the error and concurs in the request for resentencing on the mayhem conviction.

Appellant is clearly correct. Great bodily injury is unquestionably an element of mayhem; it is therefore improper to use that factor to aggravate the sentence for that offense. (*People* v. *Pitts* (1990) 223 Cal.App.3d 1547, 1559-1560 [273 Cal.Rptr. 389]; *People* v. *Keenan, supra,* at p. 36, fn. 7; § 12022.7 [prohibiting use of great bodily injury enhancement where such injury is an element of the offense].) As the court clearly erred in relying on this factor to support the upper term for the mayhem conviction appellant is entitled to resentencing on this count.

### DISPOSITION

The judgment is affirmed. The cause is remanded for resentencing in accordance with the views expressed herein.

Smith, J., and Phelan, J., concurred.

Appellant's petition for review by the Suprme Court was denied July 14, 1994.

---

[5]The court noted the following mitigating factors: appellant was under the influence of alcohol at the time of the incident; appellant was under a great deal of stress; appellant had only a "minimal" prior record; he has strong family ties; and appellant is employable and was a productive member of society.